UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Neumont University, LLC,<br><br>Plaintiff<br><br>v.<br><br>Little Bizzy, LLC, et al.,<br><br>Defendants | Case No.: 2:12-cv-1395-JAD-PAL<br><br>**Order Granting in Part Plaintiff's Motion for Default Judgment, Permanent Injunction, and Attorney's Fees and Costs [Doc. 45]** |

Having secured a clerk's default against the Defendants after they failed to appear at a Court-scheduled settlement conference and violated the Court's order directing Little Bizzy—a fictitious entity—to retain licensed counsel, *see* Docs. 25, 29, 41, 42, 44, Plaintiff, Neumont University, LLC, seeks a default judgment, permanent injunction, and attorney's fees and costs against these defaulted defendants alleged to have interfered with Neumont's professional reputation and business relationships by posting false and disparaging reviews of Neumont's educational product on the Collegetimes.com website. Doc. 45. On November 4, 2013, the Court heard oral argument, conducted an uncontested evidentiary hearing on the pending motions, and requested supplemental briefing on the propriety of injunctive relief. *See* Doc. 59. The Court has considered that supplemental brief, the original filings, and the evidence and argument offered at the prove-up hearing, enters a default judgment against Little Bizzy for the tort damages Neumont proved at the evidentiary hearing, but denies the request for attorney's fees and injunctive relief for the reasons below.

1

**Background**

Neumont is a private, for-profit limited liability company incorporated in Delaware with its principal place of business in South Jordan, Utah. *See* Doc. 1 at 2. Defendant Little Bizzy operated Collegetimes.us, a website for "students to comment on their experiences at various colleges and universities around the world." *Id.* at 4. The Collegetimes website contains a Neumont page allowing postings about the institution. *Id.* 17 postings appeared on Neumont's Collegetimes page between April 21, 2009, and August 15, 2011. Doc. 1-4 at 2-4. They criticize Neumont's business objectives and the overall quality of its consumer product. For example, content attributable to "Concerned Parent" suggests, "This is a MORMON school or did HITLER come back and move[] to UTAH." Doc. 1-4 at 2. A poster named "Justin" purportedly states, "All I remember learning from Neumont's Computer Science program was learning how to Google. You can learn as much by participating in an open source project for two years without the burden of 100K in student debt." *Id.* at 3. "No Longer a Fan" posts, "Speaking up for yourself . . . forget it. The student will end up getting burned somewhere along the way." *Id.* A posting attributable to "Graduate" provides, "I went to this hell hole of a school. They say they are accredited but they really aren't. I was planning on going for my master's in another field and half way through the program I found out that 80% of other schools in the US won't take their degree. . . . The administration don't give a shit about any of the student[s] they just want the most money they can get." *Id.* Poster "HIV Positive" is credited with stating, "This school can be summed up in 3 words 'PIECE OF SHIT,'" and "Unknown" purportedly states, "Listen to what everyone is saying if you want to go to this school don't! You will be in debt and not able to transfer your credits." *Id.* at 4.

Responsive comments by other posters suggests the postings had an impact on the marketplace. For example, "Thinking" said, "I have been thinking about going to this school for a long time. I thought it was a good school after reading the website, but now I'm having second thoughts." *Id.* at 4. Similarly, someone identified as "Eleanor Miller" stated, "My grandson is considering NU. After reading these reviews—it does not sound so good.

Especially the part where other schools won't accept the credits earned at NU." *Id.* Indeed, Neumont's page on Collegetimes is completely devoid of any positive comments about the school.

When Neumont officials attempted to add their own content to the "comments" on Neumont's page, Collegetimes added a banner that stated, "Warning: We recommend that you avoid this college." Doc. 1 at 4. Neumont officials demanded that Collegetimes remove negative postings but the request was refused. Neumont sued Collegetimes's owner, Little Bizzy, LLC, and its principal, Jesse Nickles, asserting claims for (1) business disparagement, (2) intentional interference with contractual relationships, and (3) intentional interference with prospective economic advantage under Nevada state law. *See id.* at 8-12. Neumont prayed for compensatory and special damages; punitive damages; interest, costs and attorney's fees incurred in prosecuting the action; and a permanent injunction "prohibiting Defendants and their agents, servants, employees, licensees, sponsors, associates, and affiliates, and each of them, from continuing to publish or disseminate false, defamatory and/or derogatory content aimed at harming Neumont and/or its educational services, faculty, administration, students, or staff by way of the Collegetimes website or any other publication." Doc. 1 at 11.[1]

Little Bizzy—acting through its non-lawyer principal, Nickles, moved to dismiss the complaint. Doc. 17. Defendants were advised that Little Bizzy, a fictitious entity, must be represented by counsel, and both Little Bizzy and Nickles were ordered to appear for a settlement conference. They ignored all of these orders; Little Bizzy's motion to dismiss was stricken; and clerk's defaults against them were entered. *See* Docs. 41, 42, 44. Neumont then moved for a default judgment, permanent injunction, and an award of fees and costs against both Nickles and Little Bizzy. Docs. 45, 58.

On November 4, 2013, the Court conducted an evidentiary hearing on the pending motion. Doc. 59 (minutes). As the Defendants had been defaulted, only Neumont was

---

[1] Neumont also sought a temporary restraining order and a preliminary injunction against Defendants subject to the same restrictions. Docs. 7, 8. Both motions were denied. Docs. 13, 41.

present at the hearing. Neumont offered the testimony of Stacy C. Hughes, a Neumont administrative official, who testified that other Neumont clients had attempted to post positive comments on the Collegetimes website but those posts had been deleted, and that Neumont administrators were no longer able to access the discussion page to post their own content. Hughes testified that the negative reviews had become one of the regular reasons why students were not enrolling at Neumont; she also offered lost-customer revenue evidence for 2010 through 2014 and detailed Neumont's need to pay outside consultants to manipulate Google search results to "push down" the Collegetimes page.

Hughes also introduced several tweets generated by a "Collegetimes" account from May through October 2013, that were directed towards Neumont. One posting stated, "#Neumont student reveals that administrators host 'pizza parties' to coax students to leave positive reviews online answers.yahoo.com." Doc. 58-5 at 2. Evidence was also presented that the Collegetimes twitter account posted an article entitled, "Neumont University Slanders Jesse Nickles, Little Bizzy." Doc. 58-4 at 2. Hughes testified that the Twitter postings contributed to several students declining to enroll at Neumont. Neumont calculated $1,020,000 in total lost revenue due to Collegetimes' campaign of disparagement. Doc. 58-7 at 2.

## Discussion

**A.   Motion for Default Judgment - Nickles**

Neumont has moved for a default judgment against both Little Bizzy and Nickles. Upon further review of the record, however, it does not appear that Nickles was properly served in this case. Therefore, this Court lacks personal jurisdiction over Nickles.

**1.   The Court lacks jurisdiction over Nickles.**

A summons was issued for Nickles on August 7, 2012. Doc. 6. This summons was returned unexecuted on August 28, 2012; the process server stated that he had attempted to serve Nickles by hand-delivery on two separate occasions at his last known address in California, but was told by Nickles's mother and sister that he no longer lived at the address. Doc. 15. Eventually a clerk's default was entered against Nickles on Plaintiff's counsel's

4

representation that Nickles was served via email. *See* Doc. 43-1 at 3.

"[S]ervice of process is the means by which a court asserts jurisdiction over the person."[2] When personal service is required, failure to perfect it is fatal to a lawsuit.[3] Proper service on an individual within a United States jurisdiction under Fed. R. Civ. Proc. 4(e) is accomplished only by personally serving the individual, leaving a copy of the summons and complaint "at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there," or delivering a copy to an agent authorized to accept service of process.[4] Nickles could also be served either by the methods identified by the law of the state where the district court is located or the state where service is made, which in this case is either Nevada or possibly California. Doc. 1 at 2.[5] Nev. R. Civ. Proc. 4(d)(6) requires personal service on individual defendants in the same manner as the federal rules. Email is not adequate service under the rules.[6] In California, an individual may also be served personally, at a residence, or via authorized agent.[7] California also permits service at an individual's place of business or by mail.[8]

The Court finds no evidence that service on Nickles personally was perfected under federal, Nevada, or California law. The only evidence of a personal service attempt on Nickles reflects that Neumont's "investigator" went to "1874 Shaw Court, Thousand Oaks,

---

[2] *Securities and Exchange Commission v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) (citation omitted).

[3] *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987).

[4] *Id.*

[5] *See* Fed. R. Civ. Proc. 4(e)(1). The Court must assume *arguendo* that Nickles may reside in California, as according to the statements collected by Neumont's investigator at the time he attempted to serve Nickles, it is not clear whether Nickles actually resides in California. *See* Doc. 15. Nickles's current whereabouts are unknown, although one filing stated that "[T]he sole managing member of Little Bizzy, LLC, Jesse Nickles, continues to reside far outside the United States." Doc. 36 at 1. To the degree that Nickles resides in a jurisdiction outside of the United States, this fact is not alleged in the Complaint and there is no evidence of any service attempt made pursuant to Fed. R. Civ. Proc. 4(f).

[6] *See Mayweather v. Wine Bistro, LLC*, 2013 WL 5537312, at *3 (D. Nev. Oct. 4, 2013) (noting that service via email and publication is not allowed under Nevada's service rules).

[7] *See* Cal. Civ. Proc. Code 415.10-20.

[8] *Id.* at 415.30.

5

CA 91362," and spoke with Nickles's sister, who told him that Nickles did not live there and that she did not know Nickles's current whereabouts. Doc. 15. The investigator returned to the dwelling two days later and spoke with Nickles's mother, who also stated that Nickles did not live there and that she was unsure of Nickles's current whereabouts. *Id.*

Nor can it be fairly said that service on Little Bizzy should count as service on Nickles personally. The entity was served through its agent, Mail Link, LLC. *See* Doc. 14. Although Nickles's preparation and filing of motions to dismiss and to stay discovery on behalf of Little Bizzy certainly demonstrates that Nickles was aware of the lawsuit, *see* Doc. 27, "actual notice is not an effective substitute for service of process"[9] As personal service was never properly effectuated on Nickles such that exercise of personal jurisdiction over him would be appropriate, the Court lacks personal jurisdiction over him.

**2.     The default against Nickles is set aside.**

Rule 60(a) allows the court to "correct . . . a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The Court may do so on motion or on its own, with or without notice."[10] Upon evaluation of the record, the Court finds that Nickles was never properly served and did not otherwise waive service. As judgment cannot be entered against a party not subject to this Court's personal jurisdiction, the clerk's entry of default must be set aside. Doc. 44. As a result, Neumont is not entitled to a default judgment against Nickles at this time.

---

[9] *See Abreu v. Gilmer*, 985 P.2d 746, 749 n.5 (Nev. 1999). Nickles did file documents in court, which may have been the source of some confusion about his personal participation in this case. For example, in Doc. 30 Little Bizzy and Nickles are defined as "Defendant." *Id.* at 1. *See* Doc. 30 (response to Court's denial of motion to stay discovery ruling). In the same filing, Nickles refers to himself as the "Co-defendant." *Id.* at 2. In subsequent pleadings, Nickles defined "Defendant" as "Defendants Little Bizzy and Jesse Nickles" Doc. 32 at 1 (responding to response to denial of motion to stay discovery and order to show cause); Doc. 36 at 1 (letter to the court regarding retention of corporate counsel). But Neumont did not move for entry of clerk's default on the basis that Nickles filed these documents, and Neumont has cited no authority for the proposition that these other filings establish personal jurisdiction over Nickles.

[10] Fed. R. Civ. Proc. 60(b). Although the Court may not correct an Order after an appeal has been docketed, no appeal has been docketed in this case, thus this Court retains the ability to set aside the Clerk's Entry of Default.

6

### 3. Extension of time for service on Nickles.

Fed. R. Civ. Proc. 4(m) requires service of the summons and complaint within 120 days. "If a defendant is not served within 120 days after the complaint is filed, the court–on motion or on its own after notice to the plaintiff–must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period."[11] "The plaintiff is responsible for having the summons and complaint served within the time allowed under Rule 4(m)."[12] The Ninth Circuit has interpreted Rule 4(m) to require a two-step process for granting extensions of the service period.[13] If the court finds good cause for the service delay, it must extend the time period. A court ascertains "good cause" on a case-by-case basis, the threshold requirement being excusable neglect.[14]

In this case, the complaint was filed on August 7, 2012, and an unexecuted summons was returned on August 28, 2012. Docs. 1, 15. Well over 120 days have now passed; however, the Court finds that entry of clerk's default plainly gave Neumont good cause for failing to take further action to properly serve Nickles within the time frame mandated by Rule 4(m). Thus, the Court grants Neumont an additional 60 days from the date of this order to either: effect service on Nickles and file proof of that proper service; or show good cause why such service cannot be effectuated and request an alternative method of service.

### B. Motion for Default Judgment - Little Bizzy

Neumont's request for default judgment against Little Bizzy does not suffer from the same fatal defect because it appears default was properly entered against this entity.[15] In

---

[11] Fed. R. Civ. Proc. 4(m).

[12] Fed. R. Civ. Proc. 4(c).

[13] *See in re Sheenan*, 253 F.3d 507, 512 (9th Cir. 2001).

[14] *See id.*; *Robinson v. Churchill Comm. Hosp.*, 2007 WL 496819, at *1 (D. Nev. Feb. 12, 2007).

[15] Fed. R. Civ. Proc. 55 provides a mechanism for obtaining a default judgment against a party who has failed to plead or otherwise respond to claims brought against it. Where this failure is "shown by affidavit or otherwise," the clerk must enter that party's default under Fed. R. Civ. Proc. 55(a). After entry, the movant must request a default judgment from the Court under Fed. R. Civ. Proc. 55(b)(2). *Eitel v. McCool*, 782 F.2d 1470,

*Eitel v. McCool*, the Ninth Circuit identified seven factors that district courts should generally consider when evaluating a motion for default judgment: (1) potential prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the amount of money at stake in the action; (5) the potential disputes as to material facts; (6) whether the default was due to excusable neglect; and (7) the strong federal policy favoring adjudications on the merits.[16]  Applied to the facts of this case, these factors demonstrate that a default judgment against Little Bizzy is warranted.

### 1. Possibility of prejudice, substantive merits, and sufficiency of the complaint

The Court finds that the first, second, and third *Eitel* factors all favor a default judgment against Little Bizzy.  As to the first factor, Neumont will likely suffer prejudice if default judgment is not entered because Little Bizzy has failed to properly respond to the complaint and participate in this case within the bounds of the rules, and Hughes's affidavit and the proof offered at the November 2013 evidentiary hearing demonstrates that the harm from Little Bizzy's conduct.  Doc. 58-1 at 2-4.

As to the second and third factors, Neumont's claims appear both sufficient and to have merit:

### a. Business disparagement

"To succeed on a claim for business disparagement, the plaintiff must prove: (1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages."[17]  Neumont alleges that Little Bizzy knew that some of the plainly disparaging content posted on Collegetimes's RateMyCollege page for Neumont was false; that the statements are unprivileged because Defendant's restriction of access (i.e., the

---

1471 (9th Cir. 1986); *Trustees of the Bricklayers & Allied Craftworkers Local 13 Defined Contribution Pension Trust for Southern Nevada v. Tumbleweed Development, Inc.*, 2013 WL 143378, at *2 (D. Nev. Jan. 11, 2013) (citing *Eitel*).  Additionally, Fed. R. Civ. Proc. 55(b)(1)-(2) provide that a party against whom a default judgment is sought must not be a minor or an incompetent person.  There is no evidence that Nickles is either a minor or incompetent.  Little Bizzy is a corporation to which the rule does not apply.

[16] *See Eitel*, 782 F.2d at 1471-72.

[17] *Clark County School Dist. v. Virtual Educational Software, Inc.*, 213 P.3d 496, 504 (Nev. 2009).

8

refusal to allow Neumont or others to post positive reviews) effectively made it a content provider; that Defendant demonstrated its malice by manipulating the content to ensure only negative commentary was posted; and that Neumont incurred special damages. Doc. 1 at 8-9. Neumont's factual allegations in this regard are deemed admitted by operation of the default, and the evidence offered at the prove-up hearing corroborated those allegations and independently established Neumont's damages. Thus, Neumont established a claim for business disparagement.

### b. Intentional interference with contractual relations

"To establish intentional interference with contractual relations, the plaintiff must show: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage."[18] Neumont alleges that it has contracts with students, a fact of which Little Bizzy was aware; that Defendant intended to, and actually did, disrupt Neumont's contracts with its students through its disparaging postings and dissuading of students from enrolling at Neumont; and that Neumont has "suffered losses," including the lost tuition due to the withdrawal of students as a result of Defendant's actions. Doc. 1 at 8-10. Again, these allegations are deemed admitted for purposes of this motion by virtue of default. And when combined with the overt prove-up hearing evidence of student-enrollment losses as a result of Little Bizzy's campaign against Neumont—they make out a cause of action for intentional interference with contractual relations.

### c. Interference with prospective economic advantage

A plaintiff prevails on a claim for interference with prospective economic advantage by proving: "(1) a prospective contractual relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship; (3) intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the

---

[18] *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.*, 862 P.2d 1207, 1210 (Nev. 1993) (emphasis added).

9

defendant; and (5) actual harm to the plaintiff as a result of the defendant's conduct."[19]  "A plaintiff must show that the means used to divert the prospective advantage was unlawful, improper or was not fair and reasonable."[20]  Neumont alleges that it had prospective contractual relationships with individuals interested in attending the university, and Little Bizzy knew this.  Doc. 1 at 10.  Neumont also alleges that Little Bizzy intentionally disrupted these prospective relationships without privilege or justification, resulting in actual financial harm to Neumont by loss of students and, thus, revenue.  *Id.* at 10-11.

In sum, the second and third *Eitel* factors are satisfied.

### 2. Sum of money at stake

The fourth *Eitel* factor takes into account the amount of money at stake and the seriousness of the defendant's conduct, which involves an assessment of whether the recovery sought is proportional to the harm defendant's conduct has caused.[21]  The amount of money at stake here—over $1 million dollars—is plainly significant.[22]  The evidence offered at the evidentiary hearing during which the Court took evidence regarding Neumont's claimed damages, also demonstrated that the harm that Little Bizzy's actions caused is proportional to the recovery sought.  Therefore, the fourth factor weighs in favor of a default judgment.

### 3. Possible dispute as to material facts

The fifth *Eitel* factor concerns potential disputes about material facts.  Here, the great majority of operative material facts supporting Neumont's claims have been deemed admitted as a matter of law by virtue of Little Bizzy's default and the entry of default against this defendant.  "An allegation—other than one relating to the amount of damages—is

---

[19] *Wichinsky v. Mosa*, 847 P.2d 727, 729-30 (Nev. 1993) (emphasis added); *In re Amerco Derivative Litigation*, 252 P.3d 681, 702 (Nev. 2011).

[20] *Custom Teleconnect*, 254 F. Supp. 2d 1181; *see Crockett v. Sahara Realty Corp.*, 591 P.2d 1135, 1137 (Nev. 1979).

[21] *See Trustees of the Bricklayers*, 2013 WL 143378, at *3 (citations omitted).

[22] *See id.* (finding that amount in controversy of less than $20,000 was significant in ERISA benefits action).

10

admitted if a responsive pleading is required and the allegation is not denied."[23]  The evidence presented at the November 2013 prove-up hearing corroborated those (admitted) allegations and further supported Neumont's tort claims.  Little Bizzy's failure and/or refusal to hire counsel to represent its interests further demonstrates that this entity had—and chose to pass up—ample opportunity to dispute Neumont's allegations and arguments, thus making it unlikely that Little Bizzy will demonstrate the existence of any disputed facts.  Accordingly, the Court finds that no genuine dispute of material fact precludes granting Neumont's motion, leaving only the determination of a monetary award (as that cannot be deemed admitted by operation of law).  Thus, the fifth *Eitel* factor weighs in favor of entering a default judgment.

### 4.    Excusable neglect

The sixth *Eitel* factor considers whether the default has resulted from excusable neglect.  The record in this case belies excusable neglect.  Little Bizzy was defaulted for willful failures to comply with court orders and after a no-show at a court-ordered settlement conference.  Little Bizzy had numerous chances to participate in this case but chose not to.  Thus, this sixth *Eitel* factor also weighs in favor of entering a default judgment.

### 5.    Decision on the merits

The final *Eitel* factor considers the strong policy preference for resolving cases on their merits.[24]  Little Bizzy's habitual disregard for this Court's orders casts doubt on the feasibility of any eventual decision on the merits.  The Court, therefore, finds that the ordinary policy preference favoring decisions on the merits should not, without more, preclude entry of a default judgment in this case.

In their totality, the *Eitel* factors weigh heavily in favor of a default judgment against

---

[23] Fed. R. Civ. Proc. 8(b)(6); *Geddes v. United Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977) (citation omitted) ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."); *see also Trustees of the Construction Industry and Laborers Health and Welfare Trust v. Bust Busters Air Quality Management, L.L.C.*, 2013 WL 876237, at *1-*2 (D. Nev. Mar. 7, 2013) (citing *Geddes*).

[24] *See Eitel*, 782 F.2d at 1472.

11

Little Bizzy on all three of Neumont's claims, leaving for determination only the proper amount, if any, of the default judgment.

### 6. Calculation of the default judgment

Neumont seeks: $1,020,000 for "the willful harm caused by and directly attributable to [Little Bizzy's] actions by way of Collegetimes; and attorney's fees in the amount of $84,860.50, for a total of $1,104,860.50." Doc. 61-1 at 5. The Court finds that an award of $1,020,000 in tort damages is appropriate, plus $708.00 in reimbursed legal costs, but denies an award of attorney's fees because Neumont has not demonstrated any legal basis for a fee award.

#### a. Damages

At the November 2013 prove-up hearing, Neumont submitted communications it received from prospective customers demonstrating that the Collegetimes.com postings had led them to withdraw from or pass on enrollment at Neumont, and Neumont extrapolated the amount of revenue these customers would have contributed to Neumont but for Little Bizzy's conduct. *See* Doc. 61-1. Hughes testified that Neumont employs a tracking system for all potential customers and that of Neumont's 5-8,000 potential customers, approximately 800 will begin an application for enrollment at Neumont, and approximately 70 percent of customers who complete an application will be accepted. Hughes offered evidence that 12 customers were calculated to have been lost as a result of the Collegetimes website between 2010 and 2014, which she described as a conservative calculation. Hughes calculated the loss of 12 students at $1,020,000 in total lost revenue. *See* Docs. 58-1 at 3-4; 58-7 at 2. The Court finds that Neumont has proven tort damages of $1,020,000.00 by a preponderance of the evidence and awards these damages against Little Bizzy.

#### b. Attorney's fees

The Court's jurisdiction in this case is premised on diversity of citizenship, 28 U.S.C. § 1332, so the Court applies Nevada state law to the attorneys fees request.[25] Nevada follows

---

[25] *See Hanna v. Plumer*, 380 U.S. 460 (1985); *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 883 (9th Cir. 2000).

12

the American Rule for an award of attorneys fees, thus they are not recoverable in Nevada unless authorized by agreement, statute, or rule.[26] "[T]he mere fact that a party was forced to file or defend a lawsuit is insufficient to support an award of attorney fees as damages."[27]

This is not a case premised on a contract with an attorneys fees clause, and Neumont offers no authority for its entitlement to fees for any of its three tort claims. Neumont attempts to justify its award of fees by claiming that "Defendants have repeatedly engaged in behavior designed to delay the legal proceedings, hinder the resolution of meritorious claims, and harass Neumont." Doc. 45 at 29. It points to filings made "outside those permitted by the Local and Federal Rules," as well as Little Bizzy's inability to retain counsel and respond to discovery. However, the statute it cites in support of its entitlement affords no relief here. NRS §18.010(2)(b) authorizes an award of attorneys fees "when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought or maintained without reasonable ground or to harass the prevailing party."[28] Little Bizzy's response to the complaint was struck for failure to hire counsel, and violations of other court orders, not for the grounds articulated in NRS §18.010(2)(b). As Neumont has not demonstrated its legal entitlement to attorneys fees, its request for an award of fees is denied.[29]

### c. Costs

Neumont also seeks reimbursement of its litigation expenses. The total amount of costs Neumont requests is unclear. Neumont has provided sealed billing records, and John

---

[26] *See Young v. Nevada Title Co.*, 744 P.2d 902, 905-06 (Nev. 1987); *Lubritz v. Circus Circus Hotels, Inc.*, 693 P.2d 1261, 1264 (Nev. 1985).

[27] *Sandy Valley Associates v. Sky Ranch Estates Owners Ass'n*, 35 P.3d 964, 970 (Nev. 2001), *receded from on other grounds*, 170 P.3d 982 (Nev. 2007).

[28] NRS §18.010(2)(b). NRS §18.010(2)(a) provides that attorney's fees will be awarded to the prevailing party when the judgment is less than $20,000; however, in this case the entry of default is for a far greater amount.

[29] At the November 4, 2013, prove-up hearing, the Court suggested that it would prepare the default judgment as requested. Having reviewed the papers and the record, the Court now corrects that prior statement to the extent that it improperly contemplated an award of fees and all costs.

13

Krieger, Neumont's attorney, affirms that Neumont incurred $3,263.19 in costs, Doc. 45-20 at 2, but his affidavit also lists total costs of only $1,703.34. *See id.* These costs include $470 in "Fees of the Clerk," which it states are "taxable" costs. Doc. 45-20 at 2. Neumont also claims the following "Non-taxable Costs": $33.60 in long-distance telephone calls; $238.00 in photocopies; and $961.74 in legal research.

In diversity cases, district courts award taxable costs in accordance with federal, not state, law.[30] Fed. R. Civ. Proc. 54(d)(1) states that "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be awarded to the prevailing party."[31] 28 U.S.C. § 1920 qualifies cost recovery, allowing only: "(1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; and (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."[32]

Of the costs sought, only Neumont's $470 in court fees and $238.00 in photocopies are taxable. Accordingly, the Court limits the cost award to these items and awards the total of $708.00 in costs to Neumont.

**7.   Injunctive relief**

Finally, Plaintiff also moves for a permanent injunction imposing a wide range of prohibitions on Little Bizzy's (and others') online postings, communications, and conduct, all targeted at removing current postings and preventing future publications of "false and/or disparaging statements and content" about Neumont and restraining or limiting Little Bizzy's

---

[30] *Aceves v. Allstate Insurance Co.*, 68 F.3d 1160, 1167 (9th Cir. 1995). Where costs are sought as a component of a state law damages award, a court sitting in diversity will apply state law. *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1064 (9th Cir. 2003).

[31] Fed. R. Civ. Proc. 54(d)(1).

[32] 28 U.S.C. § 1920.

14

use of its Collegetimes website. Doc. 61-1. This request asks the Court to weigh the competing interests of business reputation and free speech. Although the Court is sympathetic to Neumont's frustrations with the Collegetimes website and its criticisms of Neumont, the First Amendment's broad speech protections prevent this Court from granting the requested injunctive relief.

### a. The heavy constitutional presumption against prior restraint

The guarantees of the First Amendment "afford special protection against orders that prohibit the publication or broadcast of particular information or commentary."[33] Prior restraints are "the most serious and the least tolerable infringement on First Amendment rights."[34] And a "prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity."[35]

### b. Equity will not enjoin publication of disparaging comments.

Critical speech lies at the heart of First Amendment protections.[36] Numerous courts have recognized that enjoining the publication of disparaging information about a business is an impermissible prior restraint on free speech. For example, in *Bihari v. Gross*, an interior designer sought to enjoin a disgruntled client from posting disparaging statements about her on his website including allegations that she had "ill intentions," engaged in "alleged fraud and deceit," and had "victimized" and "scam[med]" her clients.[37] The court denied the relief, reasoning:

---

[33] *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 556 (1979).

[34] *Id.* at 559.

[35] *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971) (quoting *Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 181 (1968)); *see also Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70 (1963).

[36] *See, e.g.*, *United Bhd. of Carpenters & Joiners of Am. Local 586 v. N.L.R.B.*, 540 F.3d 957, 965 (9th Cir. 2008) ("Because free speech protections were designed to protect critical speech, we cannot find the suppression of critical speech to be a compelling interest. We find that '[t]he Mall's purpose to maximize the profits of its merchants is not compelling compared to the Union's right to free expression.'") (quoting *Fashion Valley Mall, LLC v. N.L.R.B.*, 172 P.3d 742, 754 (Cal. 2007))).

[37] 119 F. Supp. 2d 309, 324 (S.D.N.Y. 2000).

15

> The [] websites concern the business practices and alleged fraud of a well-known interior designer. Such speech is "arguably within the sphere of legitimate public concern," which imbues the speech with a heavy presumption of constitutional protection. . . . At most, plaintiffs have proven that [defendant] intends to cause plaintiffs commercial harm. This intent, however improper, cannot justify a prior restraint of constitutionally protected speech.[38]

The *Bihari* court relied on the United States Supreme Court's opinion in *Organization for a Better Austin v. Keefe*, in which the Court struck down as unconstitutional a state court injunction preventing the distribution of leaflets critical of the respondent's business practices.[39] The High Court stressed:

> It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under *Near v. Minnesota*, the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights. . . . No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court.[40]

*Keefe* recognizes the principle that "[t]he contents of speech cannot be suppressed because we find the speaker biased or the conclusions erroneous or misleading."[41] Indeed, the notion that equity will not restrain by injunction the publication of even false statements is a time-honored one.[42]

In *McLaughlin v. State of N.Y. Governor's Office of Employee Relations*, the district court similarly refused the plaintiff's request for an injunction prohibiting her former employer "from speaking about her in a derogatory manner" and "blacklisting" her from

---

[38] *Id.* at 325-26 (internal citations omitted); *see also Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 1035, 1049 (C.D. Cal. 1998) (rejecting an automobile manufacturer's request to "enjoin Defendants from . . . disseminating or publishing further false, defamatory or disparaging information about" the company or its product, the Isuzu Trooper).

[39] 402 U.S. 415 (1971).

[40] *Id.* at 418-19 (1971).

[41] *Quinn v. Aetna Life & Casualty Co.*, 482 F. Supp. 22, 30 (E.D.N.Y. 1979), *aff'd*, 616 F.2d 38 (2d Cir. 1980).

[42] *See American Malting Co. v. Keitel*, 209 F. 351, 354 (2d Cir. 1913) ("Equity will not restrain by injunction the threatened publication of a libel, as such, however great the injury to property may be. This is the universal rule in the United States and was formerly the rule in England.").

16

obtaining other state government jobs.[43]  The court concluded that it "would encounter an insurmountable constitutional barrier to enforcing plaintiff's proposed remedy"—the First Amendment prohibition on prior restraint—and concluded that McLaughlin's proper remedy would be an after-the-fact suit for damages.[44]  The court further noted as an additional consideration militating against the requested injunction that it "could not possibly design an order that would be concise enough to avoid chilling defendants' protected speech relating to the plaintiff."[45]

### c. Neumont's requested relief is constitutionally unavailable.

Granting Neumont the injunctive relief[46] it requests would be to impose an impermissible prior restraint on Little Bizzy's speech.  The Supreme Court made it clear in *Citizens United v. F.E.C.* that fictitious entities enjoy First Amendment protections, too.[47]  To prohibit Little Bizzy from "creating, publishing and disseminating false and/or disparaging statements and content regarding Neumont" or "solicit[ing], influenc[ing], or encourag[ing] any other party to create, publish and/or disseminate the same, or barring this website host from "engaging in any activity designed to interfere with, disrupt, and/or prevent relationships between Neumont and its students and/or potential students, including, but not

---

[43] 784 F. Supp. 961, 977 (N.D. N.Y. 1992).

[44] *Id*. at 978.  The Court finds the decisions in *Bihani* and *McLaughlin* persuasive and adopts their reasoning.

[45] *Id*.

[46] "An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743, 2761 (2010).  To obtain injunctive relief, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Ebay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1184 (9th Cir. 2011).  Even if this Court were to find the first three factors satisfied here, the strength of the public interest against prior restraints alone compels this Court to deny injunctive relief.  The Ninth Circuit has "consistently recognized the 'significant public interest' in upholding free speech principles."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Sammartano v. First Judicial District Court, in and for County of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated in part on other grounds*, 555 U.S. 7, 24 (2008)).

[47] *Citizens United v. F.E.C.*, 558 U.S. 310 (2010).

17

limited to, contacting students and/or potential students . . . for the purpose of disseminating false and/or disparaging statements and content, optimizing the Collegetimes website to increase search engine rankings for the Collegetimes Neumont page, and distributing and/or providing links to [] Articles," or "in any other manner, solicit[ing], influenc[ing] or encourag[ing] any other party to do the same," would be a prior restraint on speech and sweep within its ambit constitutionally protected speech and conduct.[48]  Even if the Constitution permitted this Court to restrict Little Bizzy's speech, in the manner requested, the court "could not possibly design an order that would be concise enough to avoid chilling [Little Bizzy's] protected speech relating to the plaintiff,"[49] and declines the opportunity to make such an attempt.

Consumer reporting plays a vital role in ensuring that a company's desire to maximize profit, if abused, will not go unnoticed; and online fora for the exchange of those ideas play an increasingly large role in informing consumers about the choices that make sense for them.  Although Neumont, like any legitimate business, would like to operate in a marketplace where one-sided, disparaging, and even false statements do not hamper its desire to maximize its own profits, Neumont is not entitled to conduct its affairs in an environment devoid of criticism—even false and disparaging criticism.  Because these communications implicate fiercely protected First Amendment rights, the appropriate remedy for Neumont is not a gag order or forced warning label on the Collegetimes website but an after-the-fact lawsuit for damages caused by any demonstratively tortious actions.  Accordingly, Neumont's request for a permanent injunction is denied.

---

[48] The requested relief is also overbroad.  Neumont asks the Court to extend the reach of the injunction to the website's "sponsors, associates, and affiliates" and also to Neustar, Inc., and VeriSign, Inc. (domain name registries), none of whom are parties to this litigation.

[49] *McLaughlin*, 784 F. Supp. at 978.

18

**Conclusion**

Based upon the foregoing reasons, good cause appearing, and no reason for delay,

**IT IS ORDERED** that Neumont' Motion for Default Judgment **[Doc. 45] is GRANTED** in part and **DENIED** in part:

it is **DENIED** as to Defendant Nickles.  The Clerk's Entry of Default entered against Nickles **[Doc. 44] is SET ASIDE**.  Neumont shall have 60 days to serve Nickles under Fed. R. Civ. Proc. 4, request an alternative service method, or otherwise show good cause why service cannot be made;

it is **GRANTED** as to Neumont's claims for damages against Little Bizzy.  Judgment is hereby entered in favor of Neumont and against Little Bizzy in the amount of $1,020,000;

it is **DENIED** as to Neumont's requests for attorney's fees against Little Bizzy;

it is **GRANTED** in part and **DENIED** in part as to costs against Little Bizzy.  Costs of $708 are taxed against Little Bizzy, and judgment is hereby entered in favor of Neumont and against Little Bizzy in the additional amount of $708.00 in costs;

it is **DENIED** as to Neumont's request for injunctive relief.

DATED: May 20, 2014.

_____
JENNIFER A. DORSEY
UNITED STATES DISTRICT JUDGE